Good morning, Your Honors. May it please the Court, Brett Rubin for the appellant, Aaron Hodges. There are only a couple of issues I really want to address here. One of them is the issue of the prime facie case, the large argument that's been put forward by the Postal Service is that Mr. Hodges failed to make out a prime facie case. The argument that's been made is that temporal proximity between learning of a complaint that's been made by a plaintiff and a decision to make some sort of adverse employment action is in itself enough to show the causation prong of a prime facie case. The Postal Service has argued that in this case Mr. Hodges filed his complaint more than a year before an adverse decision was made. You're talking about the second complaint? He filed two complaints, two prior complaints, I believe in April and September of 2002. Is the first one in play here at all? It's not, except to the extent that the second complaint related to the first one. I believe that his second internal EEO complaint related to his belief that he was being investigated because of the prior complaint. Do we have a copy of his second? I believe it should be in there. Of the second complaint? I believe both complaints are in the MSPB or the underlying hearing. Merit protections board. I believe that was provided in the supplemental record that was provided by the Postal Service. So the second complaint was about what? Say it again. The second complaint was related to the fact that he was being investigated in relation to these payments to Ms. Robinson.  So he believed that that investigation was related to the prior complaint he had made against the same supervisor. So the second complaint is sort of interrelated to this action. Okay. So but the point really here is the argument's been made that you can't look to temporal proximity to show causation if there's this distant time period between when the complaint is filed and when the adverse action took place. And actually, case laws are replete with circumstances where the court doesn't really look to when the complaint is filed. What the relevant inquiry is, is when did the deciding official learn that there was a complaint? And in this instance, the deciding official, Mr. Guillory, learned of the complaint at some point within a three-month period between December 23rd and when the violence was. And what's the evidence just revealed for me as to why you contend he learned of it? Because he says he doesn't. He never knew about it. Well, there's a couple of different things. I mean, one of them is he's the one that signed the documents, the final decision. And in signing it and in declarations, he has repeatedly said, I reviewed all of the evidence here. And when we talk about all of the evidence, for the most part, that refers to the investigative memorandum that was created by Inspector, I believe it was Miller. And the EEOC complaint references in those materials, he said he reviewed? Yes. Correct. And he says it several times, and we're not talking about expansive documents. We're talking about an 11-page memo with a couple of attached declarations in it. But the EEO complaint, the EEO charge, the internal EEO charge, was not attached to that report. Is that right? It is not. But the fact of it is mentioned in the report. The fact of it is mentioned in the report. And according to Mr. Hodges, in his declaration under oath, he said that when he was interviewed by Mr. Guillory on April 7th, some two weeks before he was finally terminated, that he said, I've got an EEO complaint out here. He also says that he was called by the same investigator, I believe it was Ms. Miller, to ask him about his EEO complaint only a few weeks before the final termination was made. But the relevant issue here is when did Mr. Guillory find out, and did he know? And obviously, he says I don't know. You've got some evidence that suggests that he knew, and that he learned fairly close in time between his learning and the adverse action. Well, throughout his declaration, he states, I reviewed all of this evidence. And so that seems fairly clear. Let's just assume there was a prima facie case and you move on. Okay. They come back with their legitimate reason. They say, well, we fired him because he engaged in this improper conduct. Right. And there are a couple of things that we should be looking to to show that that's pretext or that it could be pretext. Right. Or there's a factual dispute. There is a factual dispute. One of the issues is there were several other people that engaged in the same behavior that appear not to have filed any sort of internal EEO that have not engaged in any protected activity. In the investigation into this matter, it revealed that probably four or five other people engaged in the same activity. But let's assume that's hearsay. We still have a declaration from Tony Morris, a co-worker, also a supervisor, who says, admits that he did the exact same things. But he was a little bit more, he was a little bit of a different situation. Who said? He approved, what was it he did? He approved the higher grade but didn't punch the cards or to have it reversed? Well, reference is made to that in the argument put forward by the Postal Service. In fact, in the investigation, I believe it's page 108 of the record, he admits that he did both of these things, that he entered time for people at a higher pay grade and that he had his own cards and the cards of others punched for each other. So, I mean, it's not clear to me why Mr. Morris' behavior wouldn't reflect on the honesty or integrity of that worker, but Mr. Hodge's engaging in similar or the same behavior does reflect on his honesty and integrity justifying his termination. I mean, I'm sure that there are some distinguishing factors between these two things, but the fact that Mr. Morris was entering people at time grades or at pay grades higher than he was authorized to do. Did Morris hold the same level of supervisory authority as Hodge? I don't know the answer to that question. I mean, I know that he was authorized, that he was a supervisor level also, but I don't know whether or not what his governmental pay grade was in relation to Mr. Hodge's. So the government could say, well, you know, this is such a serious matter, we would have fired him anyway. I mean, there's just no question we would have fired him. Well, they could say that, except that you have these two other things that call into question whether or not those were the legitimate reasons. One is you've got other people who did the same thing and they weren't fired. And the other one is you've got Mr. Guillory saying I didn't even consider it, I didn't even know that he had filed these other complaints, but there's all this evidence that he did know about it, which calls into question his veracity in coming to the conclusion that termination was required here. Is there any evidence that shows a relationship between Guillory and was it Holden? Holden? The one who initiated, who made the initial recommendation for termination. What's his name? John Holden was the plan manager. Yes. Was there anything in the record that shows a relationship between Holden and Guillory? Not that I recall, other than that the initial report, the initial termination document was submitted for Holden for a determination. And it was actually, if you look on the report, Mr. Holden's name is on the signature line and Mr. Guillory is actually the person that signed it. So I don't know what the relationship is between those two people. Who is the principal subject of the first charge and the second charge? I believe Mr. Nikamoto is his name, was the first charge. And I may be remembering incorrectly, but I believe Mr. Holden is one of the people listed on the second charge, but I may be incorrect about that. Okay. But the Court has no other questions. Why don't we hear from the other side and then we'll give you a chance to respond. Thank you. Good morning, Your Honors. David A. DeJewitt, Assistant U.S. Attorney for the Postal Service. Judge Paz is quite correct that it's our position that he was fired for legitimate reasons. Repeatedly changing, you know, time card entries when she isn't there, when she's checking out, and paying her at a pay grade and continuing to do so when he's not authorized to do so is completely grounds to be fired. Why wouldn't you take some action against Mr. Morris? Oh, we did. Did you fire him? Absolutely not. And for several reasons. One, in the record that was presented to the deciding official, Mr. Guillory, it's very clear that Mr. Morris has a very different position than Mr. Hodges. In response to your question, Mr. Hodges was Mr. Morris's supervisor. So Mr. Hodges is a manager on top of lots of supervisors, supervisor of supervisors. So Hodges was Morris's manager. Correct. And Morris differs from Hodges in many respects. For example, Hodges says in the investigative report, that's where this comes from, that the postal inspector did, I paid people at a higher grade without authorization. Hodges never says that. He says, I did it with authorization from Nikomodo. That's a very big difference. Secondly, Hodges says that he never falsified time and attendance records, to get back to your point, without filling out a Form 1261. Hodges says, oh, yeah, I did it all the time, and 1261s, I kind of did, kind of didn't. All this is in the postal investigative memorandum. Form 1723, he has to get authorized in order to pay someone at a higher pay grade. Morris says, I would never pay anyone at a higher pay grade without a Form 1723. Hodges says the same thing, but when the postal service inspector asks for the Form 1723, can't be found. Never happened. And then he says, well, Nikomodo authorized it. Nikomodo testifies under oath, never did that. Hodges says he goes by the book. Every time he fills out a time card discrepancy, he does it 1271. Hodges says the same thing. Even worse, Morris says that. I'm sorry. Thank you, Your Honor. Hodges says the same thing. And then he says, in fact, if you look at the time in question, it will vindicate what I did. Inspector Cooper requests the time in question for the computer data sheets, and in fact, it shows discrepancies. And so the biggest difference between these two is one says, well, yeah, when confronted, I did pay people at a higher rate. Hodges says I didn't, and then continues to cover up. He's given lots of attempts to make amends or to admit or to work, and completely denies that he ever did anything like that. So you're not firing him because he falsified these time records. You're firing him. The difference between him and Morris, in your view now, is that Morris admitted that Hodges didn't. And at the time, Your Honor, because both in the proposed letter of removal and in the decision, that's mentioned. You were given lots of opportunities to correct yourself, and what did you do? You obfuscated. Same thing in the hearing before the MSPB. Why isn't that a good and maybe absolutely convincing argument to the jury? Why is there not enough evidence here at least to allow a jury to come to the other conclusion? Because there is no factual dispute, Your Honor. And I'm glad you asked that question. Well, no, there is. There may be a factual. They contend there's a factual dispute. And the question, I'm assuming a prima facie case for the purpose of my question. I'm moving on to pretext. Well, but they, they, I respectfully disagree, and I think I can show you, I think I can convince you, Your Honor, because if you look at the only time Guillory's knowledge comes into question is in the motion for summary judgment, in which he submitted a declaration. This is at 69 of the record. He says, I did not know that Hodges had engaged in prior equal employment opportunity activity at any time prior to the notice of proposed removal and letter of decision in this case. Prior to. That's not to say he didn't become aware of it when he was presented with the investigative report. Prior to? Say that one more time. Yes. Prior to the notice of proposed removal. The one given by Holden. The one prepared for Holden. The one prepared for Holden. And given to Guillory, because remember, Guillory only came in January of 03. The EEO complaints were filed in September and April of 02. So it's extremely reasonable that he comes and he's the assistant, you know, acting plant manager in January, and the first day on the job someone doesn't say, you know, by the way, Hodges a year ago filed an EEO complaint. He does become aware of it when the letter of proposed removal is presented to Holden for a signature. Holden isn't there, and Guillory instead says, what's this about? Reads the investigative memorandum, and it references an EEO complaint. Absolutely he knew about it. He never testified that he didn't know about it. But there's also no, so there's no factual dispute that he did know about it, but that he did know about it not until just before he signed the notice of removal. Now, the other side would use that timing to show the prima facie case. But again, there is no dispute about the timing either, because I say that the only relevant inquiry is an EEO complaint that happened one year ago before he was terminated. Not this one that Hodges, not this one that Guillory became aware of. You're talking about the first one. Yes, the first one, and that's a year ago. And counsel has suggested that that's not in play here. The only one that's in play is this one that happened seven months prior to when he was terminated. But there's two significant facts. One, that occurred after he knew that he was being investigated for a report, and it concerns the very same matter about which he was being investigated. Wait, wait, hold on. Let me just get this scenario right. You know the record a lot better than I do, and you're going, you're jumping over rather quickly. So there's the first EEO complaint against Nikimoto, right? Correct. September of 2009. That apparently was settled. Yes. And he was allowed to hire somebody or to appoint somebody or whatever. Yes, quite correct. Okay, and then he does that. That's right. And then there's some question raised about this timing. Then in August, there is anonymous letters received by the Postal Service, one of which implicates Hodges. Okay. It says there's bad things going on with respect to the Sheila Robinson. So then they start to investigate. Correct. And then he files a second charge, and he says, you're only investigating me because I filed that earlier charge. And there's no dispute to that. In his declaration filed in district court, he says that the EEO complaint, his thing was that the EEO complaint was done in retaliation for the investigation into his bad practices of paying and mispaying people. Under the Greeden case that the other side decided, and we have two, as well as Fred Cohen, that doesn't get you anywhere. You cannot inoculate yourself from being fired because you preemptively, not preemptively, after the fact, say, wait a minute here. This is bad. I'm filing an EEO complaint. So for two reasons, there's no factual dispute on both the prima facie case but also on retaliation of any import. We don't dispute that Guillory knew about it. Well, it's one thing to start an investigation. It's another thing to fire somebody. Well, absolutely. But you are entitled to fire somebody when an investigative report that's presented before you says he has repeatedly changed time and entry procedures. He has said he hasn't, and the evidence shows that, in fact, he lied and has. He's also paid someone at a higher rate. And when told to stop doing so, he paid her at a lower but still higher rate than she was authorized. I'm just curious. I haven't read the testimony before the board. What was his explanation? That was part of the board's finding. He does not have an explanation. And when pressed, if you read it, it's fascinating. He just goes all over the place. One of the findings of the board was that his testimony was completely evasive. He would say, I did it. Someone authorized it. MDO maddened. That's right. That's who authorized it. And, of course, then they'd have that manager come in. No, I never authorized it. Nikimoto. Well, I didn't know it was Nikimoto. I might have been confused. He just never commits, and he always evades the question. He's not believable, and for good reason. Because at the times that he's caught by his own previous statements, when he had said previously, I can get you the documentation to show that I'm vindicated, the documentation that he presented actually indicts him. And all that was in the investigative report, and all that was what the deciding officials relied upon. The only evidence presented in opposition are two declarations. One by Hodges, which says, well, you know, this isn't true, which is really self-serving. And two is by Morris, who says, well, I did it, too. But he didn't do it, too. And the only way he did it, too, was in a very, very different way, and not nearly so egregiously, and never trying to cover up or hide. This is not someone who is similarly situated. There is no evidence in the record that the other side has developed that shows a disparate treatment or that shows that Morris is in all respects, as required under the Ninth Circuit, similar to show that Hodges, or that the Postal Service didn't honestly believe that they were firing someone because we had someone who was unrepentant in paying someone higher, continuing to pay someone higher, and falsifying time records. Was there any evidence in the record that showed that Hodges sort of encouraged Guillory? Sure. To fire him? Hodges encouraged, oh, no, no. To the contrary. Hodges, fire that guy, he's a pain in the neck. No, not none. In fact, I think you mean Holden. Holden, I'm sorry. No, in fact, the reason Guillory signed, he was only there four months. So the first action he has as acting plant manager is when he gets this letter. And the only reason he signed it is because Holden has by this time left. And he is no longer physically in the plant and will not return. And so you have Holden gone, physically absent from the plant, but the titles haven't changed. And so rather than plant manager, he's acting plant manager. And the form until he testifies this at the MSPB, the form is such that until you have an actual transfer officially, I'm just the acting one. And so I sign for his name, and so I become the plant manager. The only other thing I would say. Hodges had left. Holden had left. Holden, I'm sorry. And would not return. And Guillory would leave in two or three months' time. He was there for a total of four months. I see. And the only other thing I would mention is they've made a big part about people not being punished. In the record, that was asked of the postal inspector. She said that she did an independent analysis of everyone who was alleged to have done something wrong. Ten people were found to have done something wrong, and ten people were punished. Same thing with Holden. They asked him that question. Have you learned of other things, and were other people punished? Yes. Did that occur with people other than those who filed EEO complaints? Absolutely. That's the evidence. One statement by Morris, which is contradicted by his previous statements and the evidence, just doesn't get you to the jury. Now, was Morris punished in any way? He was punished. He says, I did not receive any discipline for entering higher-level pay for employees after being instructed not to do so. Is that just false? I believe that's false, Your Honor, and for two reasons I believe that. One, Inspector Cooper testified at the MSPB hearing that every single person who was found to have done something wrong was punished. And John Holden said the same thing. I would also ---- Do we have anything in the record specific to Morris? He testifies at the MSPB hearing, and in fact, he, as you correctly said, in his declaration says that he was never reprimanded. But in the testimony during the MSPB hearing, he says that, in fact, I was reprimanded. If you look at the record 175, pages 11 through 12 of the supplemental excerpts of record. I'm sorry. Give me S.E.R. S.E.R. 175, 11 through 12. Mines 11 through 12. And Cooper's 10 out of 10 in proprieties and discipline are S.E.R. 49, 4 through 8. And Holden, others were disciplined, who did not file EEOs, is S.E.R. 108, 17 to 22. But you're going to read something to me from that page 175 that Morris says? Yes, sir. What's he say? On page 175? Yeah. He says that. I don't have the S.E.R. in front of me. I'm sorry, Your Honor. That's okay. Let me start a little bit earlier to give you a context. Page 174, 18. Were you interviewed? This is the Postal Service attorney asking Morris. Were you interviewed by? Who's under oath? Were you interviewed by postal inspectors regarding? Yes. This investigation? Yeah. And were you interviewed regarding your attendance at a retirement party while on the clock? Right. And did you accept a settlement in connection with that? Well. I'm sorry. I went too fast. I'm sorry. And did you accept a settlement in connection with that? Well, they said they were just going to give me some time off. That's what they said. Some time off with pay? No. I didn't have any time off. They said they were. Okay. So nothing happened to you as a result of this? No. Well, were you reprimanded? Yes. Did you feel that your attendance and so on was justified? What did you mean by that? Did you feel that it was permissible pursuant to Postal Service regulations for you to do this thing? Okay. Well, that's the way we used to do things. When you were doing it, were you aware that it wasn't according to postal regulations? No. And then he goes on. The relevant part is, were you reprimanded? Question. Answer. Yes, I was. And I couldn't quite get the full context, but it sounds as though, like he put in a timesheet for going to a party? Yes. He, it's about clocking in and clocking out. Right. He clocked in and then he was supposed to clock out and didn't on his own. And he got paid for attending a party. And, of course, this is the kind of thing that Morris was accused to have done, which is an entirely much less thing than Hodges was accused to have done. Okay. You may be able to, I'll just read. During my interview with U.S. Inspection Service, I admitted to entering higher level pay for employees after I was instructed not to do so. I've never engaged in any activity. I did not receive any discipline of entering higher pay levels. He doesn't say I wasn't reprimanded for entering my own timesheet when I was at a party. But that comes, Your Honor, from the investigative memorandum. That's where that statement is. And if you look at the investigative memorandum and the memo of interviews that the postal inspector had with Morris, you'll find that she discovered that during the investigation, followed up with him during that memo, and then concluded that the only thing he had done were minor as compared to what Hodges had done. And all of the things that differentiate them are found in that investigative report. Okay. Thank you. Thank you. Sorry for keeping you over. My pleasure. Two first comments. First, I believe that statement actually came from Mr. Morris's declaration, not from the investigative memorandum. Second thing is there was a lot of talk there about what came up in the MSPB and what the findings of the LJ in the MSPB was. Those findings aren't really relevant. What's relevant is what's the evidence that was considered on the summary judgment motion. Whether or not Mr. Hodges hemmed or hawed or had a bunch of different stories, those are stories that should be put before a jury. And the bottom line is there is a factual dispute between what Mr. Morris has to say and what the Postal Service is now putting forward and what Mr. Hodges had to say in terms of his authorization to pay people at higher rates or his belief that he had the right to do that. I wouldn't dispute that there are discrepancies in the record, but there are discrepancies in the record from what Mr. Guillory has to say, what Mr. Hodges has to say, what Mr. Morris has to say, and what many other people have to say also. These are factual issues that should be put before a jury to decide. That's all. Thank you. Thank you both sides for a useful argument. Hodges v. Potter now submitted for decision. Last case on our argument calendar, and thank you for being so patient, Colbert v. Fontana Police Department.
judges: Fletcher, Paez, Duffy